**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **COURT OF MASTER SOMMELIERS, AMERICAS,** | Case No. ___2:25-cv-05255-RMG___ |
| Plaintiff | |
| **ASHLEY BROSHIOUS, and HOW TO DRINK WINE,** | **COMPLAINT** |
| Defendants. | |

Plaintiff Court of Master Sommeliers, Americas ("CMS" or "Plaintiff"), brings this Complaint against Defendants Ashley Broshious ("Broshious") and How to Drink Wine ("HTDW") (collectively, the "Defendants"), and alleges as follows:

**INTRODUCTION**

1.      This is an action for willful trademark infringement, unfair competition, and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a); misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the South Carolina Trade Secrets Act, S.C. Code Ann. § 39-8-10 *et seq.*; breach of contract; unjust enrichment; unfair and deceptive trade practices under the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*; unfair competition and passing off under South Carolina common law; and declaratory judgment.

2.      The Court of Master Sommeliers is the premier certifying organization for sommeliers and beverage professionals worldwide. CMS offers courses and certification exams directed to sommeliers of all levels throughout the Americas, including throughout the United States.  CMS vigorously protects the integrity of its testing and certification process, and CMS's

distinctive trademarks are widely recognized by both industry professionals and consumers as a result.

3.     Defendants have exploited CMS's intellectual property, including by infringing CMS's trademarks and by misappropriating CMS's confidential and proprietary examination materials, in order to build a commercial coaching business.  Defendants' conduct wrongfully exploits CMS's hard-earned goodwill, misleads consumers, and threatens the integrity of CMS's internationally respected sommelier certification program.

**THE PARTIES**

4.     Plaintiff CMS is a nonprofit mutual-benefit corporation organized under California law with its principal place of business at 315 Meigs Road, Suite A-302, Santa Barbara, California 93109.

5.     On information and belief, Defendant Ashley Broshious is a resident of Charleston, South Carolina.

6.     On information and belief, Defendant HTDW is a business co-founded, owned, and controlled by Broshious with its principal place of business in Charleston, South Carolina.

**JURISDICTION AND VENUE**

7.     The Court has jurisdiction over the subject matter of this action under Section 39(a) of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338(a) and (b), as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction under 28 U.S.C. § 1332, and the amount in controversy in exceeds $75,000.

8.     Personal jurisdiction exists over each Defendant because, on information and belief, Broshious is a resident of South Carolina, HTDW maintains its principal place of business in South Carolina, and the acts complained of were committed in, directed to, and caused injury

within this State.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred here.

## ALLEGATIONS COMMON TO ALL CLAIMS

**CMS's Intellectual Property and Certification Process**

10.     Since 1985, CMS has offered tiered educational courses and certification examinations culminating in the internationally renowned Master Sommelier Diploma.  Only 279 professionals around the world hold the title of Master Sommelier.  CMS is guided by a distinguished board of directors, composed of Master Sommeliers and other subject matter experts, which sets the organization's strategic direction and upholds the organization's high standards.  CMS credentials signal exceptional competence and professionalism in wine and beverage service.

11.     During that time, CMS has extensively and continuously promoted, marketed, advertised, and offered its educational and certification services in connection with its distinctive trademarks and branding.

12.     In addition to the common law trademark rights it has acquired, CMS owns numerous federal registrations for its trademarks in written and stylized form, as shown below (collectively, the "CMS Marks"):

//

//

//

| Trademark | Registration No. | Registration Date (First Use Date) | Class(es) and Services |
|---|---|---|---|
|  | 2,384,665 | Sep. 12, 2000 (Dec. 31, 1987) | **41** – Educational services, namely, conducting lecture and demonstration courses in the fields of wine and evaluation, selection, and service of wine, distilled spirits, liquers, and cigars by wine stewards |
| **COURT OF MASTER SOMMELIERS** | 2,384,781 | Sep. 12, 2000 (Dec. 31, 1987) | **41** – Educational services, namely, conducting lecture and demonstration courses in the fields of use of wine and evaluation, selection, and service of wine, distilled spirits, liqueurs, and cigars by wine stewards |
|  | 4,262,432 | Dec. 18, 2012 (Mar. 1, 2010) | **41** – Educational services, namely, conducting lecture and demonstration courses in the fields of use of wine and evaluation, selection, and services of wine, distilled spirits, liqueurs, and cigars by wine stewards and distribution of training materials in connection therewith; Educational services, namely, conducting programs and providing certified examinations in the field of sommelier services and distribution of training material in connection therewith; Educational services, namely, developing, arranging, and conducting educational conferences and programs and providing courses of instruction in the field of sommelier services |

| Trademark | Registration No. | Registration Date (First Use Date) | Class(es) and Services |
|---|---|---|---|
| **COURT OF MASTER SOMMELIERS AMERICAS** | 4,273,271 | Jan. 8, 2013 (Mar. 1, 2010) | **41** – Educational services, namely, conducting lecture and demonstration courses in the fields of use of wine and evaluation, selection, and services of wine, distilled spirits, liqueurs, and cigars by wine stewards and distribution of training materials in connection therewith; Educational services, namely, conducting programs and providing certified examinations in the field of sommelier services and distribution of training material in connection therewith; Educational services, namely, developing, arranging, and conducting educational conferences and programs and providing courses of instruction in the field of sommelier services |
| **MASTER SOMMELIER** | 4,473,561 | Jan. 28, 2014 (Mar. 1987) | **B** – Sommelier services, namely, providing advice on wine and wine and food pairing |

13.     Each registration for the CMS Marks is valid, subsisting, and incontestable, and evidences CMS's exclusive right to use the CMS Marks in commerce.

14.     The CMS Marks are inherently distinctive and have acquired secondary meaning, signifying to the relevant public that services offered under the marks originate with CMS.

15.     CMS has invested substantial resources in advertising, marketing, and promoting its services under the CMS Marks, and has developed significant goodwill and public recognition

in the marks.

16.     CMS's Marks are widely recognized in connection with CMS's educational and certification services.  CMS's certification process is known throughout the industry as the gold standard for its rigor, impartiality, and the high standards it represents.

17.     In particular, approximately 75,000 people have passed a CMS course, including nearly 60,000 individuals in the United States with at least one CMS credential.

18.     Courses and exams are conducted regularly throughout the United States and worldwide.  The organization's dedicated staff, including examination coordinators and educators with decades of experience, are responsible for operating CMS's exams, educational materials, and certification programs.

19.     The upper three levels of CMS's certification program—Certified Sommelier, Advanced Sommelier, and Master Sommelier—each require the candidate to pass a three-part examination, consisting of a theory component, a practical service component, and a blind tasting component in which candidates are required to use a deductive method to identify red and white wines.

20.     CMS's exam questions, service scenarios, and the identities of wines used for tasting (collectively, "CMS Materials") are confidential and proprietary.  Candidates agree before taking every exam, at any level, to follow the CMS Candidate Code of Conduct, which emphasizes the confidential nature of the CMS Materials and strictly prohibits the disclosure of exam content.[1]  These measures are designed to protect the integrity and value of CMS's certification process and the goodwill associated with the CMS Marks.

21.     CMS has developed strict and detailed procedures to protect the security and

---

[1] The Current CMS Code of Conduct is available online here: https://www.mastersommeliers.org/about-us/code-of-conduct/, *archived at* https://perma.cc/LG23-FHCJ.

confidentiality of the CMS Materials, including both digital materials created in preparation for examinations and physical materials used at examination sites. CMS investigates any breach of these procedures rigorously and takes any necessary action in response, up to and including invalidation of an examination.

22.     CMS invests significant resources to create, maintain, and protect the CMS Materials, which are not generally known or readily ascertainable by competitors or candidates, or by consumers generally. Disclosure of CMS Materials would provide an unfair advantage and undermine the value of CMS credentials.

**Defendants' Infringement and Misappropriation**

23.     Broshious first enrolled in CMS programming on or about March 23, 2009, and eventually earned Introductory, Certified, and Advanced Sommelier credentials. She has also taken the Master Sommelier Diploma Examination.

24.     As a candidate, before taking each of these examinations, Broshious acknowledged the proprietary and confidential status of the CMS Materials, and agreed in writing to a version of the CMS Candidate Code of Conduct, which prohibited any disclosure, dissemination, or solicitation of exam content, and incorporated CMS's disciplinary procedures and remedies.

25.     Broshious understood that she was obligated to maintain the confidentiality of the CMS Materials, including but not limited to specific exam questions, service scenarios, and the identities of wines used for tasting, both during and after her participation in CMS examinations.

26.     In or around 2023, Broshious launched HTDW in order to sell coaching services and purportedly prepare candidates for CMS examinations.

27.     Defendants advertise these educational services through frequent and misleading

use of CMS's Marks, both in written and stylized form.

28.     For example, Defendants prominently featured the COURT OF MASTER SOMMELIERS mark in multiple advertisements posted on YouTube, Instagram, and Facebook, and have similarly used the related "CMS" acronym, the "Certified Sommelier Examination" phrase, and elements of CMS's stylized and distinctive branding throughout their website and social media pages.

29.     Defendants' use of the CMS Marks in connection with their services is without CMS's authorization or consent.

30.     Defendants' use of the CMS Marks is in commerce and in connection with the sale, offering for sale, distribution, and advertising of their coaching services, which overlap with and are related to CMS's own educational and certification services.

31.     Defendants' use of the CMS Marks is likely to cause confusion, mistake, or deception among consumers and the relevant trade as to the affiliation, connection, or association of Defendants with CMS, or as to the origin, sponsorship, or approval of Defendants' services by CMS. Consumers are likely to believe, incorrectly, that Defendants' business is sponsored, endorsed, or otherwise affiliated with CMS.

32.     Defendants have also obtained CMS Materials outside of testing conducted by CMS.

33.     On information and belief, Broshious contacted and interviewed at least one candidate immediately after CMS examinations in order to obtain specific CMS test questions and scenarios. She did this despite knowing that such materials are confidential and proprietary, and that any candidate who agreed to her request would violate the Candidate Code of Conduct.

34.     Broshious compiled this content into written and video study guides that she

marketed through HTDW. Upon information and belief, she also used this content in oral coaching of candidates using HTDW services.

35.     Defendants charge students for access to the HTDW course materials that incorporate CMS's intellectual property, including theory questions, wine-identification pools, and scripted service exercises derived from specific content used in recent CMS examinations.

36.     This wrongful use of CMS materials is prohibited by the CMS Candidate Code of Conduct, further suggests an affiliation with CMS, and otherwise harms CMS's reputation.

37.     CMS repeatedly attempted to address its concerns with Defendants' conduct, including through a letter sent by CMS—and acknowledged by Broshious—in August 2023.

38.     In September 2024, CMS, through counsel, issued a cease-and-desist letter documenting Broshious's unauthorized dissemination of CMS Materials and her continued unlicensed use of CMS Marks in marketing HTDW courses. The letter demanded immediate cessation and delivery of all misappropriated and infringing materials.

39.     Despite multiple attempts by CMS to secure a mutually agreeable resolution, Broshious ignored CMS's demands. As a result, and in line with CMS policy, CMS commissioned an independent third-party investigation of Broshious's conduct. Based on the results of that investigation, and after discussion, the CMS Board revoked her credentials and suspended her from all CMS programming by resolution dated April 29, 2025.

40.     Despite the revocation of Broshious's credentials and multiple follow-up notices, Defendants continued to display CMS Marks on www.howtodrinkwine.com, as well as on YouTube, Instagram, Facebook, including wording such as "Certified Sommelier Exam," images of CMS certification pins, and other elements mimicking CMS's own distinctive branding.

41.     HTDW's "About Us" page touts Broshious's "unique tasting methodology" and

claims she is "currently pursuing the Master Sommelier Diploma," despite her suspension.

42.     Defendants' conduct falsely implies that CMS endorses, sponsors, or is otherwise affiliated with Defendants' services, and that Broshious remains a CMS-certified Advanced Sommelier in good standing.

43.     Defendants' conduct is willful, intentional, and undertaken with knowledge of CMS's prior rights in the CMS Marks.  Defendants' actions have caused and are likely to continue to cause irreparable injury to CMS's reputation, as well as the goodwill developed by CMS in its brand.

## COUNT I
## Trademark Infringement – § 32 of the Lanham Act (15 U.S.C. § 1114)
## (Against All Defendants)

44.     CMS realleges and incorporates by reference paragraphs 1-43 as if fully set forth herein.

45.     CMS owns valid, subsisting, and incontestable federal registrations for the CMS Marks.

46.     The CMS Marks are inherently distinctive and have acquired secondary meaning, signifying to the relevant public that services offered under the marks originate with CMS.

47.     Defendants, without CMS's consent, have used in commerce reproductions, counterfeits, copies, or colorable imitations of the CMS Marks in connection with the sale, offering for sale, distribution, or advertising of coaching services that are directly competitive with CMS's own services.

48.     Defendants' coaching services are directly related to the educational and certification services offered by CMS under the CMS Marks, further increasing the likelihood of consumer confusion.

49.     Defendants' use of the CMS Marks is likely to cause confusion, mistake, or

deception among consumers and the relevant trade as to the affiliation, connection, or association of Defendants with CMS, or as to the origin, sponsorship, or approval of Defendants' services by CMS. Defendants' use of the CMS Marks is likely to cause consumers to believe, incorrectly, that Defendants' offerings originate from, or have been authorized, sponsored, approved, or endorsed by CMS, or that Defendants' business is otherwise connected to, sponsored by, or affiliated with CMS in some way, when that is not the case.

50.     Defendants' use of the CMS Marks is willful and intentional, undertaken with knowledge of CMS's prior rights in the CMS Marks and with the intent to trade on the goodwill and reputation associated with the CMS Marks.

51.     Defendants' acts constitute trademark infringement in violation of 15 U.S.C. § 1114. As a direct and proximate result of Defendants' wrongful acts, CMS has suffered and will continue to suffer irreparable injury to its reputation and the goodwill developed by CMS in its brand. The extent of this harm cannot be ascertained at this time, leaving CMS without any adequate remedy at law.

52.     By reason of the foregoing, CMS is entitled to injunctive relief against Defendants, restraining Defendants from further acts of infringement of the CMS Marks and, after trial, recovery of any damages proven to have been caused by reason of Defendants' infringing acts, including but not limited to Defendants' profits, CMS's actual damages, and the costs of this action under 15 U.S.C. § 1117, as well as treble damages for willful trademark infringement, attorneys' fees, and costs.

/

## COUNT II
### False Designation of Origin and Unfair Competition – § 43(a) of the Lanham Act (15 U.S.C. § 1125(a))
### (Against All Defendants)

53.     CMS realleges and incorporates by reference paragraphs 1-52, as if fully set forth herein.

54.     The CMS Marks are used in commerce in the United States (and globally) in connection with CMS's educational and certification services.

55.     Defendants' unauthorized use of the CMS Marks and false statements that Broshious holds CMS credentials misrepresent the origin, sponsorship, or approval of Defendants' services.

56.     Defendants' unauthorized use of the CMS Marks and false statements regarding Broshious's credential status were made in connection with the advertising, promotion, and sale of Defendants' own related educational and coaching services.

57.     Defendants' promotion, advertising, and offering of their services in connection with the CMS Marks is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association between Defendants and CMS, and is likely to cause members of the public to believe, incorrectly, that Defendants' services are sourced from, or provided, endorsed, approved, or sponsored by CMS, when that is not the case.

58.     Defendants' use of the CMS Marks therefore constitutes false designation of origin, passing off, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

59.     Defendants' use of marks confusingly similar to the CMS Marks, without CMS's consent, has caused and is likely to continue to cause irreparable injury to CMS's reputation, as well as the goodwill developed by CMS in its brand.  The extent of this harm cannot be ascertained at this time, leaving CMS without any adequate remedy at law.

60.     By reason of the foregoing, CMS is entitled to injunctive relief against

Defendants, restraining Defendants from further acts of false designation and unfair competition, and, after trial, recovery of any damages proven to have been caused by reason of Defendants' wrongful acts, including but not limited to Defendants' profits, CMS's actual damages, and the costs of this action under 15 U.S.C. § 1117, as well as treble damages for willful conduct, attorneys' fees, and costs.

### COUNT III
### Trade-Secret Misappropriation – Defend Trade Secrets Act (18 U.S.C. § 1836)
### (Against All Defendants)

61.    CMS realleges and incorporates by reference paragraphs 1-60, as if fully set forth herein.

62.    The CMS Materials derive independent economic value from not being generally known and are subject to reasonable measures to maintain secrecy, including extensive and detailed confidentiality procedures, limited access, and secure storage.

63.    The CMS Materials constitute trade secrets under 18 U.S.C. § 1839(3) because they comprise compilations, methods, and processes used to evaluate sommelier proficiency; have actual and potential independent economic value by virtue of their secrecy; and CMS has implemented robust safeguards to prevent their unauthorized dissemination.

64.    The CMS Materials relate to educational and certification services that are used in, and intended for use in, interstate and foreign commerce.

65.    Defendants, with knowledge that the CMS Materials were acquired through improper means, used and disclosed those trade secrets in interstate commerce to market HTDW services.

66.    Defendants' conduct constitutes actual and threatened misappropriation under 18 U.S.C. §§ 1836(b)(1), 1839(5).

67.    CMS has suffered monetary loss and irreparable harm and is entitled to injunctive

relief, exemplary damages, and attorneys' fees.

68.     Defendants' misappropriation was willful and malicious within the meaning of 18 U.S.C. § 1836(b)(3)(C), because Defendants acted with actual knowledge of CMS's secrecy measures and in conscious disregard of CMS's rights after receiving multiple written warnings. Accordingly, CMS is entitled to exemplary damages in an amount up to two times its compensatory damages, as well as reasonable attorney fees under 18 U.S.C. § 1836(b)(3)(D).

**COUNT IV**
**Trade Secret Misappropriation – South Carolina Trade Secrets Act (S.C. Code Ann. § 39-8-10 *et seq.*)**
**(Against All Defendants)**

69.     CMS realleges and incorporates by reference paragraphs 1-68 as if fully set forth herein.

70.     The CMS Materials derive independent economic value from not being generally known and are subject to reasonable measures to maintain secrecy, including confidentiality procedures, limited access, and secure storage.

71.     Defendants, with knowledge that the CMS Materials were acquired through improper means, used and disclosed those trade secrets in interstate commerce to market HTDW services.

72.     The CMS Materials constitute trade secrets under S.C. Code Ann. § 39-8-20(5).

73.     Defendants misappropriated the CMS Materials as defined by S.C. Code Ann. § 39-8-20(2).

74.     CMS is entitled to injunctive relief, actual damages, punitive damages, and attorneys' fees.

**COUNT V**
**Breach of Contract**
**(Against Defendant Ashley Broshious)**

-14-

75.    CMS realleges and incorporates by reference paragraphs 1-74 as if fully set forth herein.

76.    Broshious entered valid, enforceable agreements with CMS, including but not limited to the CMS Candidate Code of Conduct and prior versions thereof (collectively, the "Agreements").

77.    The Agreements are supported by adequate consideration, including Broshious's receipt of access to CMS courses, examinations, and proprietary materials, as well as the opportunity to earn CMS credentials.

78.    The Agreements clearly set forth Broshious's obligations to maintain the confidentiality of CMS examination content and to refrain from unauthorized use or disclosure of CMS intellectual property.

79.    The Agreements prohibit disclosure or solicitation of exam content and unauthorized use of CMS intellectual property.

80.    Broshious materially breached the Agreements by soliciting and disseminating the CMS Materials, using CMS Marks without authorization, and continuing such conduct after written notice.

81.    Broshious's breaches were willful and continued after CMS provided written notice and an opportunity to cure—in addition to performing all of its own obligations—thereby excusing CMS from any further performance under the Agreements.

82.    CMS has sustained damages in an amount to be proven at trial, including investigative costs, lost revenue, and harm to goodwill.

83.    CMS's damages include, but are not limited to, the costs of investigating Broshious's conduct, expenses incurred to replace compromised examination materials, and

diminution of the value of CMS's credentials and reputation.

84.     As a direct and proximate result of Broshious's breaches, CMS has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

85.     CMS is entitled to all remedies available under South Carolina law for breach of contract, including actual damages, consequential damages, injunctive relief, and attorneys' fees as provided by the Agreements and applicable law.

### COUNT VI
### Unfair and Deceptive Trade Practices – South Carolina Unfair Trade Practices Act
### (S.C. Code Ann. § 39-5-10 et seq.)
### (Against All Defendants)

86.     CMS realleges and incorporates by reference paragraphs 1-85, as if fully set forth herein.

87.     Defendants engaged in unfair or deceptive acts in trade or commerce, including false representations of credential status, misuse of CMS Marks, and sale of services incorporating stolen CMS materials.

88.     Defendants' conduct has a tendency to deceive and has injured CMS and the public.

89.     Defendants' conduct has an adverse effect on the public interest by deceiving consumers and undermining the integrity of professional certification in the wine and hospitality industry.

90.     CMS is entitled to injunctive relief, treble damages, and attorneys' fees under S.C. Code Ann. § 39-5-140.

### COUNT VII
### Common Law Unfair Competition and Passing Off
### (Against All Defendants)

91.     CMS realleges and incorporates by reference paragraphs 1-90, as if fully set forth

herein.

92.     Defendants' actions have caused and are likely to continue to cause confusion among consumers as to the source, sponsorship, or affiliation of Defendants' services, resulting in harm to CMS's reputation and goodwill.

93.     Defendants' actions constitute unfair competition and passing off under South Carolina common law, entitling CMS to damages, restitution, and injunctive relief.

## COUNT VIII
### Common Law Unjust Enrichment
### (Against All Defendants)

94.     CMS realleges and incorporates by reference paragraphs 1-93, as if fully set forth herein.

95.     CMS has conferred substantial benefits upon Defendants by providing access to CMS's educational content and the goodwill associated with CMS's distinctive trademarks and certification program.

96.     Defendants, without authorization or consent from CMS, have knowingly and willfully misappropriated and infringed CMS's intellectual property and confidential materials—including but not limited to CMS's examination questions, tasting samples, service scenarios, and registered trademarks—in connection with the marketing, promotion, and sale of Defendants' commercial coaching services.

97.     Defendants have received and retained the benefit of CMS's intellectual property, confidential materials, and reputation, which have enabled Defendants to attract customers, generate revenue, and build their own business, all at the expense of CMS.

98.     Defendants' retention and use of these benefits is unjust because Defendants obtained and exploited CMS's proprietary materials and goodwill through improper means, including in violation of confidentiality obligations and after repeated written demands to cease

such conduct.

99.    Defendants' conduct has resulted in direct and unjust enrichment to Defendants, including but not limited to: (a) revenues and profits derived from the sale of coaching services incorporating CMS's confidential and proprietary materials; (b) the enhancement of Defendants' business reputation and marketability through the unauthorized use of CMS's trademarks and credentials; and (c) the avoidance of costs and investments that would otherwise have been necessary to develop independent educational content and goodwill.

100.    CMS has suffered harm as a result of Defendants' unjust enrichment, including significant expenses, lost revenue, diminution of the value of its intellectual property and credentials, and harm to its reputation and goodwill.

101.    It would be inequitable for Defendants to retain the benefits conferred by CMS without payment of fair value or restitution to CMS.

**COUNT IX**
**Declaratory Judgment - 28 U.S.C. §§ 2201–2202**
**(Against All Defendants)**

102.    CMS realleges and incorporates by reference paragraphs 1-101, as if fully set forth herein.

103.    An actual, present, and justiciable controversy exists between Plaintiff and Defendants concerning the parties' respective rights and obligations with respect to (a) the CMS Marks, including the exclusive right to use and license those marks in connection with sommelier–related educational and certification services; (b) the CMS Materials, including their status as protectable trade secrets; and (c) Defendants' continuing use of the CMS Marks and CMS Materials following Plaintiff's revocation of Defendant Broshious's CMS credentials.

104.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, this Court has the power to declare the rights and other legal relations of any interested party seeking

-18-

such declaration where an actual controversy exists within its jurisdiction.

105.    A judicial declaration resolving the foregoing disputes is necessary and appropriate because such relief will terminate and clarify the legal relationship of the parties, prevent ongoing and future harm to Plaintiff arising from Defendants' wrongful conduct, and promote judicial economy by obviating the need for duplicative or piecemeal litigation.

106.    Accordingly, Plaintiff respectfully requests that the Court enter a judgment declaring that: (a) Plaintiff is the exclusive owner of the CMS Marks and all associated goodwill; (b) Defendants have no right, title, interest, or license to use the CMS Marks in any manner; (c) the CMS Materials constitute protectable trade secrets belonging exclusively to Plaintiff; (d) Plaintiff's revocation of Defendant Broshious's CMS credentials was valid and effective; and Any further use, display, disclosure, or dissemination by Defendants of the CMS Marks or CMS Materials would be unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief from this Court as follows:

A. Injunctive relief preliminarily and permanently enjoining Defendants, their agents, and all persons in active concert with them from:

   i.    Using any CMS Marks or confusingly similar designations;

   ii.   Representing that Broshious holds any CMS credential or affiliation;

   iii.  Soliciting, using, or disclosing CMS trade secrets; and

   iv.   Offering or providing any product or service that incorporates or is derived from the CMS Materials.

B. Declaratory judgment pursuant to 28 U.S.C. § 2201 as outlined above.

C. Ordering Defendants to deliver up for destruction all infringing materials, including

digital files, social-media content, marketing collateral, and course materials.

D.  Awarding CMS:

      i.  Defendants' profits, CMS's actual damages, and the costs of this action under 15 U.S.C. § 1117;

     ii.  Treble damages for willful trademark infringement and unfair competition;

    iii.  Compensatory and punitive damages for trade-secret misappropriation and unfair trade practices;

    iv.  Exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C) & (D) and S.C. Code Ann. §§ 39-8-30, 39-5-140; and

     v.  Pre- and post-judgment interest.

E.  Awarding CMS such other and further relief as the Court deems just and proper.


Respectfully submitted,

**PERKINS COIE LLP**


By: */s/ Thomas J. Tobin*

Date:  June 10, 2025

Thomas J. Tobin, S.C. Bar No. 103068
District of South Carolina Attorney ID 12703
TTobin@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Telephone: +1.206.359.8000
Facsimile:  +1.206.359.9000